## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TIMOTHY SAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TIMOTHY BUDZ, THOMAS MONAHAN, | )   Civil Action No.: 05 C 6394 |
| RAYMOND WOOD, SHAN JUMPER, | ) |
| STEVE STROCK, ROEN ISHAM, LEA | )   Suzanne B. Conlon, Judge |
| CHANKIN, CAROL VANCE, JOVITA | ) |
| ANYANWU, VICKY KOKAS, and LIBERTY | ) |
| HEALTH CARE CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Timothy Sain, a civilly committed detainee of the Illinois Department of Human Services,

filed a *pro se* complaint against Timothy Budz, Thomas Monahan, Raymond Wood, Shan Jumper,

Steve Strock, Roen Isham, Lea Chankin, Carol Vance, Jovita Anyanwu, Vicky Kokas and the Liberty

Health Care Corporation.[1] Defendants filed motions to dismiss, which were granted in part and

denied in part.[2] Subsequently, the court appointed counsel for Sain.

---

[1]The docket reflects Budz was never served with a summons and a copy of the complaint. *See* Dkt. No. 94 (May 25, 2006) (summons returned unexecuted). Pursuant to Fed. R. Civ. P. 4, Budz is dismissed without prejudice.

[2]Count I was dismissed as to Monahan and Kokas. Mem. Op. and Order, Dkt. No. 74 (March 3, 2006). Count III was dismissed as to Monahan, Wood, Jumper, Chankin, and Liberty Healthcare, and Count III was dismissed as to Strock, Kokas, and Isham with respect to the claims based on the method of dispensing medication and the policy of requiring armed guards to transport residents who need emergency care. *Id.*; Mem. Op. and Order, Dkt. No. 87 (March 29, 2006). To the extent that Count V alleges a claim under the Thirteenth Amendment, that claim was dismissed. *Id.*

Anyanwu, Vance, Strock, Isham, Monahan, Kokas, Wood, Jumper and Chankin move for summary judgment. Wood, Jumper and Chankin also move to strike and to deem admitted portions of Sain's Local Rule 56.1(b)(3) response to their Local Rule 56.1(a)(3) statement. For the reasons set forth below, the motion to strike and the summary judgment motions are granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Sain was civilly committed to the custody of the Illinois Department of Human Services pursuant to the Sexually Violent Persons Commitment Act, 725 ILCS 207/1 *et seq.* Liberty Facts at ¶ 2. From 2000 to 2006, Sain was held at the department's Joliet Treatment and Detention Facility ("the Joliet facility"). *Id.* at ¶¶ 2, 3. At all relevant times, Drs. Raymond Wood, Shan Jumper and Lea Chankin ("the Liberty defendants") were employed by Liberty Healthcare Corporation in supervisory clinical roles at the Joliet facility. *Id.* at ¶¶ 4-6. Wood was the clinical director, Jumper was the associate clinical director, and Chankin was a team leader until she became the associate clinical director in 2005. *Id.* Thomas Monahan, Steve Strock, Roen Isham and Vicky Kokas ("the Department of Human Services defendants") were employed by the Illinois Department of Human Services. DHS Facts at ¶¶ 3-5. Since September 2005, Monahan served as director of the Treatment and Detention Program for Sexually Violent Persons. *Id.* at ¶ 3. Strock and Isham were housing unit directors at the Joliet facility. *Id.* at ¶¶ 4-5. Kokas was employed at the Joliet facility, but the record does not identify her position. *Id.* at ¶ 6. Dr. Jovita Anyanwu and Carol Vance were employed by Addus Health Care and worked at the Joliet facility as a physician and the director of health care, respectively. Addus Facts at ¶¶ 4-5. Sain is HIV positive. *Id.* at ¶ 10.

2

The Joliet facility is comprised of a new unit, built in 2001, and an old unit, built in the late 1800's. Pl. Additional Facts (Liberty) at ¶ 73. Sain was housed in the old unit. Addus Facts at ¶ 3. The cells in the old unit are small, containing two bunks, a sink, a toilet, and a small window. Pl. Additional Facts (Liberty) at ¶ 77. The paint was chipping off the walls of Sain's room, and the outdated plumbing emitted a foul odor. *Id.* at ¶ 86. The cells in the old unit are not air conditioned. *Id.* at ¶ 78. Residents cannot control the temperature of their cells in the heat of summer, and Sain's cell became very hot. *Id.* at ¶ 79. Residents were told to open their windows for ventilation, but some windows, including Sain's, did not have screens. *Id.* at ¶ 77. Opening the window allowed bees, wasps and spiders to come into his cell. Compl. Count I.

Sain's cell was infested with roaches. Pl. Additional Facts (Liberty) at ¶ 81. Sain saw roaches crawling around his cell, coming from under his bed and out of cracks in the wall and sink. *Id.* According to Sain, he was bitten several times, and was treated for bites by his physician, Dr. Anyanwu. *Id.*; DHS Facts at ¶ 17. But Anyanwu testified he could not recall finding any evidence of a bite. Addus Facts, Ex. D at 97-98. An exterminator visited the Joliet facility on a regular basis and sprayed Sain's room. DHS Facts at ¶ 18.

Sain repeatedly requested to be moved to the air conditioned new unit. Pl. Additional Facts (Liberty) at ¶¶ 82, 96, 78. But each time his request was denied by the rooming committee. DHS Facts at ¶ 26. The Joliet facility rooming committee is in charge of housing residents. Liberty Facts at ¶ 39. The rooming committee meets monthly, and keeps minutes of all monthly meetings. Pl. Additional Facts (Liberty) at ¶ 104. During discovery, the Liberty defendants only produced minutes from two rooming committee meetings. *Id.* at ¶ 105. Sain's requests to move were discussed by the rooming committee and denied. DHS Facts at ¶ 26. A variety of reasons were given for the denial,

3

including Sain's HIV status, his history of sexually "acting out" with other residents, and his failure to successfully participate in treatment. *Id.* Sain challenges the validity of the reasons that the rooming committee gave for denying his requests. Pl. Resp. Facts (DHS) at ¶ 26; Pl. Additional Facts (DHS) at ¶¶ 79-81; Pl. Additional Facts (Addus) at ¶¶ 55-56. Sain also claims he corresponded and spoke with certain defendants regarding his conditions of confinement and his desire to move. Pl. Additional Facts (Liberty) at ¶¶ 83-90; Pl. Additional Facts (Addus) at ¶ 47. Defendants assert they never received any correspondence, and were unaware of Sain's complaints. Liberty Facts at ¶¶ 7-32, Addus Facts at ¶ 13.

There were also problems with Sain's drinking water. In both the old and new units, water was supplied by a Joliet facility well. Pl. Additional Facts (DHS) at ¶ 90. The water smelled foul and was brown in color. *Id.* ¶ 91; Pl. Resp. Facts (Liberty) at ¶ 7. A facility workers' union arranged a supply of bottled water for employees. *Id.* at ¶ 93. Bottled water was not made available to residents. *Id.*

A 2001 letter sent by the Joliet Correctional Center warden generally advised the Joliet facility that the "gross alpha" in the water supply exceeded the Illinois Pollution Control Board's maximum level, but posed minimal short term risk to consumers, and that no special precautions were needed. Addus Facts at ¶ 12. The letter further noted that alpha radiation could produce tissue damage, which could lead to cancer in a very small portion of the population. Compl. Ex. A-1. Joliet facility annual drinking water quality reports noted the presence of contaminants, and stated that some people, including those with HIV, can be particularly at risk from infections. Pl. Additional Facts (Addus) at ¶ 61. According to the U.S. Environmental Protection Agency, the water contained several contaminants during the time Sain was a resident. *Id.* at ¶ 59. The

4

Environmental Protection Agency indicated that contaminants of the type found in the Joliet facility's water supply could lead to an increased risk of cancer. *Id.* at 62-63. The National Cancer Institute classifies HIV as a risk factor for cancer. *Id.* at 64.

Sain told Anyanwu and Vance he believed the water was dangerous to his health and was causing cramps, vomiting and blood in his stool. Pl. Additional Facts (Addus) at ¶ 57. Anyawanu informed Sain that he had no knowledge concerning the effect of the drinking water on Sain's health. Addus Facts at ¶ 13. Anyanwu and Vance deny that Sain ever told them he believed the water was harmful to his health. Addus Reply at 6-7 (deposition citations therein).

Monahan was aware of annual notices from the Illinois Environmental Protection Agency regarding water quality. Pl. Additional Facts (DHS) at ¶ 94. Sain did not tell Monahan he believed the water was injuring him. DHS Facts at ¶ 36. Sain testified he had no basis to conclude Isham and Kokas believed the water was unsafe to drink. *Id.* at ¶ 30. But Sain asserts Isham was aware of complaints that the water ran brown, and she never drank the water. Pl. Resp. Facts (DHS) at ¶ 32. Sain also asserts Strock told him the water was unsafe to drink, but Strock disputes this assertion. *Id.* at ¶ 31; DHS Reply Ex. A.

In Sain's combined memorandum in opposition to defendants' summary judgment motions, Sain declined to respond to the issues with respect to his racial discrimination claim in Count I, his allegations against Liberty Healthcare Corporation in Count I, and Counts III, IV, and V in their entirety. Pl. Mem. at 17-18, 25.

**DISCUSSION**

**I.     Summary Judgment Standard**

Summary judgment is proper when the moving papers and affidavits show there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A movant has the initial burden of demonstrating an entitlement to summary judgment. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Once a movant has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Cont'l Cas. Co.*, 427 F.3d at 1041. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the nonmoving party. *Id.* A genuine issue of material fact exists when the evidence is sufficient to support a reasonable jury verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**II.     Section 1983 Standard**

As a civilly committed detainee, Sain is protected by the due process clause of the Fourteenth Amendment. *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998). His protections are at least as extensive as those against cruel and unusual punishment extended to prisoners by the Eighth Amendment. *See id.*; *see also Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (applying Eighth Amendment analysis to a § 1983 claim brought by a Joliet facility resident awaiting a civil commitment trial). The Eighth Amendment requires defendants to house Sain under "humane conditions," and to provide him with "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a conditions of confinement claim, Sain must show (1) a sufficiently serious deprivation; and (2) defendants' deliberate indifference in causing his

6

deprivation. *Id.* at 837. The test for deliberate indifference is a subjective one: the official must know of and disregard an excessive risk to Sain's health or safety. *Id.* The official must "both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Sain sued Budz, Monahan, Wood, Jumper, Strock, Isham, Chankin, Vance, Anyanwu, and Kokas in their individual capacities. Compl. at ¶¶ I(F), I(H). To survive summary judgment on a claim for individual liability under § 1983, Sain must raise an issue of material fact as to each defendant who purportedly caused or participated in the constitutional deprivation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). To satisfy this requirement, Sain must respond to the motions by advancing evidence that each defendant knew about a deprivation, and facilitated, approved or turned a blind eye to the problem. *Id.*

## III.    Count I: Cell Conditions

### A.    Constitutional Deprivation

Under the Eighth Amendment, Sain is entitled to be housed in "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Farmer,* 511 U.S. at 837. Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). Conditions that might not otherwise violate the Eighth Amendment may constitute violations if they persist over an extended period of time. *Id.* at 643. Some conditions that on their own would not violate the Eighth Amendment, may cumulatively constitute a violation. *Id.; see also Antonelli v. Sheahan*, 81 F.3d 1422, 1431-33 (7th Cir. 1996) (cold, inadequate food, lack of recreation, excessive noise, and pest infestation established a viable Eighth Amendment claim). Sain complains of continuous pest infestation, excessive heat, outdated

7

plumbing, foul odors, and falling plaster in his cell. Compl., Ct. I at ¶ B. He endured these problems since October 2000. Addus Facts at ¶ 3.

To prevail on summary judgement, defendants must establish that there is no genuine issue for trial regarding whether Sain's conditions of confinement violate the Eighth Amendment. *Farmer,* 511 U.S. at 837. Defendants contend Sain did not suffer any injury as a result of his living conditions beyond a few insect bites, and conclude that his conditions of confinement claim must fail. DHS Facts at ¶¶ 19-21. However, Sain is not required to establish a present injury. *Helling v. McKinney,* 509 U.S. 25, 33 (1993) (a prisoner established an Eighth Amendment claim by alleging he was exposed to high levels of tobacco smoke posing a risk to his future health). The Eighth Amendment protects against current conditions that pose a risk of future harm. *Id.; see also Dixon,* 114 F.3d at 644 ("[c]old temperatures need not imminently threaten inmate's health to violate the Eighth Amendment"). Viewing the facts in the light most favorable to Sain, a reasonable jury could find that his living conditions, taken together and considering the length of time he endured them, constitute a violation of the Eighth Amendment. The question should be resolved by a jury. *Dixon,* 114 F.3d at 643 (question of whether severity of cold in combination with length of time inmate endured it violated Eighth Amendment was "peculiarly appropriate" for resolution by the trier of fact).

## B. Deliberate Indifference

To prevail on summary judgment, defendants must meet their burden of establishing that there is no genuine issue of material fact and they did not act with deliberate indifference to Sain's living conditions. Deliberate indifference means acting in an intentional or criminally reckless manner. *Salazar v. City of Chicago,* 940 F.2d 233, 239 (7th Cir. 1991). This is a subjective

8

determination. *Farmer*, 511 U.S. at 839. To act recklessly, a person must consciously disregard a substantial risk of serious harm. *Id.* To survive summary judgment on this claim, Sain must tender some evidence that defendants knew about his living conditions and approved or turned a blind eye to them. *Gentry*, 65 F.3d at 561.

### (1) Addus Defendants

#### (a) Anyanwu

Dr. Anyanwu was Sain's primary care physician. Addus Facts at ¶ 4; Pl. Additional Facts (Addus) at ¶ 45. Anyanwu and Sain dispute whether Anyanwu knew about Sain's living conditions and whether Sain asked for Anyanwu's help in transferring to the new unit. Pl. Resp. Facts (Addus) at ¶ 13; Pl. Additional Facts (Addus) at ¶ 47, Addus Reply at 3. These facts are material to a determination of whether Anyanwu acted with deliberate indifference. Anyanwu testified he was not aware of the conditions in Sain's cell. Addus Facts, Ex. D at 117. Anyanwu admits he was aware that the old unit was not air conditioned and recalls residents telling him their cells were hot in the summer. Pl. Additional Facts (Addus) at ¶ 42. But he did not know residents' cells were "too hot." Addus Facts, Ex. D at 116. Anyanwu treated Sain for roach bites, but does not recall actual evidence of bites. *Id.,* Ex. D at 97-100. It is undisputed Anyanwu knew that Sain was HIV positive. *Id.* at ¶ 10. But Anyanwu testified that because Sain's HIV was being treated, he was not more susceptible than non-HIV residents to illnesses or conditions caused by roach or insect bites. *Id.*, Ex. D at 71-72.

Sain argues that as primary care physician for the Joliet facility, Anyanwu had the authority to issue medical orders for residents to be moved to the new unit. Pl. Additional Facts (Addus) at ¶¶ 45-46. Sain asked Anyanwu to recommend a transfer to the new unit and Anyanwu refused,

9

saying he did not have anything to do with cell assignments. *Id.* at ¶ 47, Ex. 1 at. 104-06. Anyanwu denies Sain asked him to recommend that he be moved to the new unit. Addus Facts, Ex. D at 117-18.

Viewing the facts in Sain's favor, a reasonable jury faced with these material factual disputes could conclude that Anyanwu knew of Sain's conditions, had the authority to recommended a move to the new unit, and acted with deliberate indifference by refusing to do so. Accordingly, summary judgment must be denied with respect to Anyanwu on Count I.

### (b) Vance

Vance was director of health care at the Joliet facility and a member of the rooming committee since 2000. Addus Facts at ¶ 5; Pl. Additional Facts (Addus) at ¶ 48. She attended three to four rooming committee meetings over the last six years, but cannot recall if Sain was discussed at any of those meetings. *Id.* at ¶ 50. Sain wrote to Vance asking why there was a medical decision that he be single-celled. *Id.* at ¶ 56. Sain wanted to know because residents of the new unit were double-celled. *Id.* at ¶ 54. Vance responded there was a medical order that Sain be single-celled, but she could not find the order. *Id.* at 56. Sain maintains there was no order. Sain Resp. at 17.

The disputed existence of a medical order that Sain be single-celled is material to the rooming committee's denial of Sain's requests to move to the new unit. However, the purported medical order is not material to the question of whether Vance acted with deliberate indifference to Sain's living conditions. Sain fails to present evidence suggesting Vance was aware of his living conditions. Vance attended only three to four rooming committee meetings over a six year period and claims not to recall any discussion about Sain. Viewing the facts in the light most favorable to Sain, a reasonable jury could not infer Vance was involved in the rooming committee's refusal to

10

move him to the new unit. Nor can knowledge of Sain's living conditions be reasonably inferred from their correspondence about a particular medical order that he be single-celled. Vance knew Sain wanted to move to the new unit. But without any evidence she knew he wanted to move because of his living conditions, Sain cannot establish Vance was deliberately indifferent to his constitutional deprivation. Accordingly, Vance's motion for summary judgment on Count I must be granted.

### (2)     Liberty Healthcare Defendants

#### (a)     Wood

Raymond Wood was employed by Liberty Healthcare Corporation as clinical director of the Joliet facility from 1998 to 2005. Liberty Facts at ¶ 4. Wood maintains he was not aware of Sain's living conditions. *Id.* at ¶ 10. He states he never had direct, face-to-face contact with Sain regarding the conditions in his cell or his desire to move to the new unit. *Id.* at ¶ 7. Wood does not recall receiving any correspondence from Sain, nor does he keep a correspondence file. *Id.* at ¶ 8. He was a member of the rooming committee, but does not recall whether Sain was discussed at any of the meetings he attended. *Id.* at ¶ 9.

Sain disputes Wood's statements. Sain wrote a letter to Wood regarding the conditions in his cell, including roaches, flies, bees, wasps, spiders, a foul odor from the water, and falling paint chips. Pl. Additional Facts (Liberty) at ¶ 83. Sain also requested to speak to Wood about his conditions of confinement. *Id.* at ¶ 84. Sain testified he had a face-to-face discussion with Wood about his desire to move. *Id.* at ¶ 83.

Viewed in the light most favorable to Sain, the disputed existence of his letter to Wood describing his living conditions could support a reasonable inference Wood was aware of his

11

conditions of confinement. A reasonable jury could give credence to Sain's testimony and conclude that Wood received and read the letter and was in fact aware of Sain's living conditions. While there is no ironclad rule that any communication to a prison official constitutes adequate notice of a violation of the Eighth Amendment, a jury could find that Sain demonstrated, by the content of the letter and the manner of its transmission, that Wood knew about his living conditions. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). The disputed facts about Wood's knowledge are material. Accordingly, Wood's motion for summary judgment on Count I must be denied.

Wood argues that even assuming he knew of Sain's living conditions, he is entitled to judgment as a matter of law. First, Wood asserts he was not deliberately indifferent because he had no direct involvement in rooming committee decisions denying Sain's request to move. Liberty Mem. at 10. But this argument fails because Wood can be liable under § 1983 for merely "turning a blind eye" to Sain's living conditions; a specific action or decision is not required. *Gentry*, 65 F.3d at 561. Wood was clinical director of the Joliet facility, and the record does not indicate Wood was powerless to correct the problems with Sain's living conditions. There are triable issues concerning both Wood's knowledge of Sain's conditions and his ability to correct them.

Second, Wood argues Sain has no due process right to be housed in the living unit of his choice. Liberty Mem. at 10. This argument mischaracterizes Sain's claim. *See* Mem. Op. and Order, Dkt. No. 87 (March 29, 2006) at 6-7. Sain does not assert a right to choose his cell or unit; he claims the inhumane conditions in his cell represented an unconstitutional deprivation and that defendants were deliberately indifferent to his plight. *Id.* (citing Compl. Ct. I).

Third, Wood argues he was not deliberately indifferent to Sain's conditions because he observed professional standards and knew Sain was under treatment by medical professionals. It is

12

generally appropriate for non-medical staff to rely on decisions of medical staff. *Greeno v. Daley*, 414 F.3d 654, 655-56 (7th Cir. 2005). Staff must exercise professional judgment, but a court should not determine in hindsight which of several professionally acceptable choices should have been made. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). Liability can only be imposed when the decision reflects a substantial departure from professional judgment. *Id.* at 323.

Wood's assertion that he is entitled to deference fails. A reasonable jury could conclude that Sain's letter describing the conditions in his cell was sufficient to alert Wood to a constitutional violation. The jury could find that Wood's decision to do nothing to help Sain was a departure from accepted professional judgment.

Wood argues he is entitled to qualified immunity because Sain can cite no case clearly establishing his specific constitutional violation. Liberty Mem. at 15. Sain need not cite a case involving a plaintiff with identical characteristics and claims to establish a sufficiently serious constitutional deprivation. *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (liability is not predicated on the existence of a prior case directly on point). The Supreme Court articulated a well-established constitutional right to humane conditions of confinement in *Farmer v. Brennan*, 511 U.S. at 832. Woods was clinical director of the Joliet facility. Liberty Facts at ¶ 4. He supervised the associate clinical director and indirectly supervised the clinical staff. *Id.* As the individual with the highest level of clinical responsibility, a reasonable person in Woods' position would have known Sain's purported living conditions were a constitutional deprivation. Wood is not entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

### (b) Jumper

Shan Jumper is presently employed by Liberty Healthcare Corporation as the clinical director of the Joliet facility. Liberty Facts at ¶ 5. Jumper previously served as the associate clinical director of the Joliet facility, a team leader supervising therapists, and a primary therapist. Pl. Resp. Facts (Liberty) at ¶ 5. Sain claims Jumper knew about his living conditions because he wrote a letter to Jumper about his cell's foul odor and the falling paint chips; he spoke with Jumper about his desire to move to the new unit; he received a grievance response from Jumper regarding his desire to move; and he requested to speak with Jumper multiple times over a period of four years. Pl. Additional Facts (Liberty) at ¶¶ 85-87. Jumper never responded. *Id.* at ¶ 87. Sain claims Jumper, as a member of the rooming committee, could have influenced a decision to transfer him to the new unit. *Id.* at ¶ 93; Pl. Mem. at 11-12.

Jumper denies he was aware of Sain's living conditions. Jumper contends Sain never complained to him about his living conditions or told him he was concerned about how his conditions were affecting his HIV status. Liberty Facts at ¶ 15. Jumper does not recall receiving any correspondence from Sain, nor does he keep a correspondence file. *Id.* at ¶ 14.

Assuming for purposes of this motion that Jumper received Sain's letter, the letter is insufficient to show the inhumane nature of Sain's purported living conditions. Pl. Additional Facts (Liberty) at ¶ 86. Sain admits his letter to Jumper did not discuss the roaches, bees, wasps, or spiders in his cell. Pl. Resp. Facts (Liberty) at ¶ 17. Sain offers no evidence to show Jumper was aware of the roach infestation and other insects in his cell, or the heat and lack of ventilation. Pl. Additional Facts (Liberty) at ¶¶ 85-87. Sain testified he talked to Jumper about his request to move to the new unit, but he presents no evidence showing he specifically mentioned his cell conditions. *Id.*

14

Requesting to speak to Jumper about his conditions of confinement fails to raise an issue of fact regarding Jumper's awareness because his requests did not describe the conditions. *Id.*

Nor does Jumper's membership on the rooming committee demonstrate awareness of Sain's living conditions. Sain fails to offer evidence that Jumper was present at a rooming committee meeting when Sain's complaints were addressed. The rooming committee met monthly and was required to keep minutes. Pl. Additional Facts (Liberty) at ¶ 103. Sain made multiple requests to be transferred to the new unit, but the Liberty defendants only produced minutes from one meeting when Sain was mentioned. *Id.* at ¶¶ 82, 104. The record does not indicate the extent to which Jumper had access to rooming committee documents such as residents' transfer requests or copies of minutes. Nor does Sain present evidence that his requests to the rooming committee described his living conditions. Sain does not present any facts, beyond Jumper's membership on the rooming committee, to support a reasonable inference that Jumper was aware of his living conditions. Accordingly, Jumper's motion for summary judgment on Count I must be granted.

### (c)    Chankin

Lea Chankin was employed by Liberty Healthcare Corporation as a team leader, supervising a group of sex offender treatment providers from 2003 to October 2005. Liberty Facts at ¶ 6. Since October 2005, Chankin has served as the associate clinical director of the Joliet facility. *Id.* Sain maintains Chankin was his primary therapist at some point in 2002 or 2003, but Chankin denies this. Pl. Resp. Facts (Liberty) at ¶ 20. Sain had contact with Chankin when she served on the behavior committee, when she acted as a team leader, when she facilitated his therapy group, and when she encountered him in his housing unit. Liberty Facts at ¶ 21. Sain claims Chankin knew about his living conditions because he spoke to her about the roaches and insects in his cell; in response she

15

told him to contact the appropriate person to have his room sprayed. *Id.* at ¶ 23; Pl. Resp. Facts (Liberty) at ¶ 23. Sain claims Chankin, as a member of the rooming committee, could have granted his request to move to the new unit. Liberty Facts at ¶ 25; Pl. Mem. at 11-12. Chankin does not recall learning the basis for Sain's transfer request. *Id.* However, she does recall his request was denied because of his "history of acting out." *Id.*

In discovery responses, Sain asserts Chankin knew about his living conditions because he wrote her a letter describing them. Pl. Resp. Facts (Liberty) at ¶ 23. She denies he ever wrote her. Liberty Facts at ¶ 24. The Liberty defendants contend that Sain's assertion that he wrote to her contradicts his prior deposition testimony. Liberty Reply at 6-7. Sain's deposition testimony states he *told* Chankin about the roaches in his room. He testified he did not write to her about them. Liberty Facts at ¶ 24.[3] Liberty contends the court should not consider Sain's statement that he wrote Chankin a letter about his living conditions based on the principle that an affidavit that conflicts with earlier deposition testimony must be disregarded. *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006). However, Liberty fails to cite authority in support of its argument that this principle extends to contradictory discovery responses as well as affidavits. The court may consider Sain's later statement in his discovery response that he wrote a letter to Chankin regarding his living conditions.

Chankin argues that even if she knew about Sain's living conditions, she acted reasonably and with sound professional judgment by telling Sain to contact the appropriate person to call the exterminator. Liberty Mem. at 11 (citing *Collignon*, 163 F.3d at 989); *see also Farmer*, 511 U.S.

---

[3]In its reply, Liberty acknowledges that its statement of facts mistakenly cites an incorrect exhibit number for Sain's deposition. The accurate cite is to pages 45-46 of Sain's deposition, in which he states that he did not write to Chankin.

at 845 (prison officials who act reasonably cannot be held liable under the Eighth Amendment). Chankin acted reasonably. She advised Sain to complain to the appropriate person. As a clinical doctor, it was not her role to address pest control issues. *See Greeno,* 414 F.3d at 656 (inmate health and safety is promoted by the existence of a "division of labor" within a prison). It was reasonable for Chankin to assume the problem would be addressed because she knew exterminators regularly visited the Joliet facility. Liberty Facts at ¶ 23. Her actions cannot be viewed as facilitating, approving or turning a blind eye to his living conditions. *Gentry,* 65 F.3d at 561. Therefore, Chankin's motion for summary judgment on Count I must be granted.

## (3) Department of Human Services Defendants Strock and Isham

Steve Strock and Roen Isham were housing unit directors at the Joliet facility who both served on the rooming committee. DHS Facts at ¶¶ 4-5, 22. The rooming committee denied Sain's requests to move to the new unit because of his HIV status, his history of sexually "acting out," and his failure to successfully participate in treatment. *Id.* at ¶ 26. Sain vigorously disputes the veracity of these reasons for denial of his transfer request. Pl. Mem. at 15; Pl. Resp. Facts (DHS) at ¶¶ 26, 27. However, Sain does not offer evidence that Strock and Isham were aware of his living conditions.

The actual reasons for the rooming committee's denial of Sain's requests are relevant to a determination of whether Strock and Isham were deliberately indifferent to his conditions of confinement. But without any evidence of their awareness of his living conditions, Sain cannot survive summary judgment. To make the subjective showing required under *Farmer v. Brennan,* Sain must present evidence to support a reasonable inference that they knew about his living

17

conditions. He failed to do so. *Gentry*, 65 F.3d at 561; *Farmer*, 511 U.S. at 837. Accordingly, summary judgment must be granted in favor of Strock and Isham on Count I.

## IV.    Count II: Water Quality

### A.    Sufficient Deprivation

Defendants contend Sain's constitutional claim based on his drinking water fails as a matter of law. Under the Eighth Amendment, Sain is entitled to be housed in "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Id.* at 832. Detainees are not entitled to an environment completely free of pollutants. *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). But where a detainee has a particular medical condition, such as HIV, he is entitled to be free from an environment harmful to his future health. *Alvarado*, 267 F.3d at 653 (subjecting an asthmatic prisoner to an environment with ambient tobacco smoke could pose a serious risk to his future health and therefore constituted a violation of the Eighth Amendment). Viewing the facts in the light most favorable to Sain, a reasonable jury could conclude that Sain's HIV status made him more vulnerable to contaminants in the water.

Defendants argue Sain failed to produce evidence of actual injury from the drinking water. Sain need not prove a present injury to prevail on a claim arising from unsafe drinking water. *Robinson v. Page*, 170 F.3d 747, 748 (7th Cir. 1999); *see also Helling v. McKinny*, 509 U.S. 25, 33 (1993) (observing that a detainee "could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery").

### B.    Deliberate Indifference

To establish liability under § 1983, Sain must show defendants acted with deliberate indifference in providing unsafe water. *Farmer*, 511 U.S. at 837. Sain must produce evidence

18

defendants knew about the quality of his drinking water and the risk it posed to him, and approved or ignored the situation. *Gentry*, 65 F.3d at 561.

### (1) Anyanwu and Vance

Anyanwu, Sain's primary care physician, and Vance, the director of health care, contend they did not know about problems with the drinking water at the Joliet facility, nor did they know about Sain's concern that the water was affecting his HIV status.[4] It is undisputed Anyanwu and Vance knew of Sain's HIV status. Addus Facts at ¶ 10. But they contend because Sain's HIV was treated, his immune system functions at the level of a non-HIV person. Addus Mem. at 7 (citing Anyanwu Dep. at 60-61). According to Anyanwu and Vance, even if the water was harmful, it was no more harmful to Sain than to a non-HIV positive person. *Id.* Whether Sain's immune system is more vulnerable than a non-HIV positive person is a material issue of disputed fact.

Sain told Anyanwu and Vance he believed the water was dangerous to his health and was causing cramps, vomiting and blood in his stool. Pl. Additional Facts (Addus) at ¶ 57. Sain testified Anyanwu responded he had no knowledge that Sain's symptoms were caused by the water. Pl. Resp. Facts (Addus) at ¶ 13. Anyanwu and Vance deny Sain ever expressed his concerns to either of them concerning the drinking water at the Joliet facility. Addus Facts, Ex. D at 95-97, Ex. E at 31. Vance testified she drinks the water herself. *Id.*, Ex. E at 31. The record indicates Anyanwu treated Sain

---

[4]Anyanwu and Vance and the Department of Human Services defendants argue there is no genuine issue of material fact because the documents Sain offers to show the water was hazardous to him are inadmissible hearsay evidence. Addus Reply at 8-9; DHS Reply at 4-5. Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible at trial. *Eisenstadt v. Centel Corporation*, 113 F.3d 738, 742 (7th Cir. 1997). The court considered those portions of Sain's submissions admissible under one of the exceptions to the prohibition against hearsay because all reasonable inferences must be drawn in Sain's favor. *Lynch v. Alpharma, Inc.*, No. 05 C 3065, 2006 WL 1120510 at *1 (N.D. Ill. April 27, 2006) (Aspen, J.). *See also* Fed. R. Evid. 802-804.

approximately 25 times for stomach cramps, vomiting and blood in his stool. *Id.* at ¶¶ 16-32. Anyanwu prescribed a variety of treatments including fluids, Maalox, Tylenol and prescription medicine. *Id.*

Anyanwu and Vance argue Sain's symptoms were not new, and therefore were not caused by unsafe water. They contend Sain has a history of nausea caused by his HIV medications, and his symptoms could have been a reaction to his HIV medications. Addus Facts at ¶ 16. Sain does not dispute that he has a history of nausea, but argues Anyanwu and Vance should have investigated whether the water was causing his symptoms. Pl. Resp. Facts (Addus) at ¶ 16.

Anyanwu and Vance contend they were not deliberately indifferent because they had no control over the water supply. They assert Sain cannot establish an affirmative link between them and his constitutional deprivation. *Gentry*, 65 F.3d at 561. This argument fails. While Anyanwu and Vance did not have control over the water supply, a reasonable jury could infer, based on their positions as primary care physician and director of health care, that they had the authority to ensure Sain was provided with bottled water. It is undisputed Anyanwu had the authority to issue medical orders. Pl. Additional Facts (Addus) at ¶ 45. Anyanwu's orders had never been challenged. *Id.* at ¶ 46. A reasonable jury could also infer that, based on her role as director of health care, Vance could have requested that Anyanwu issue a bottled water order on Sain's behalf.

Anyanwu and Vance contend Sain's dissatisfaction with his medical care cannot constitute a violation of the Eighth Amendment as a matter of law. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) ("the Eighth Amendment is not a vehicle for bringing claims for medical malpractice"). A prisoner's dissatisfaction with his medical treatment does not give rise to a constitutional claim unless the treatment was likely to seriously aggravate the prisoner's condition. *Id.* at 592. Viewing

20

the disputed facts in Sain's favor, a reasonable jury could find he was vulnerable to contaminants in the water due to his HIV status and that unsafe water aggravated his chronic gastric symptoms. On these facts, Anyanwu and Vance's failure to secure a clean supply of drinking water for Sain or to rule out water as the cause of his complaints could constitute deliberate indifference. Accordingly, summary judgment on Count II must be denied.

### (2)     DHS Defendants

#### (a)     Strock, Isham and Kokas

Steve Strock, Roen Isham and Vicky Kokas were employed by the Illinois Department of Human Services. DHS Facts at ¶¶ 3-5. They worked in various roles at the Joliet facility. *Id.* During the time Sain resided at the Joliet facility, Strock and Isham were employed as housing unit directors. *Id.* at 4-5. The record does not indicate Kokas' role at the facility. The Department of Human Services defendants contend that Sain conceded his claims against Strock, Isham and Kokas. During his deposition, Sain testified had no reason to believe that Strock, Isham, or Kokas believed the water was dangerous to drink, that none of them had done anything wrongful to him and that he was not seeking to recover monetary damages from them. *Id.* at ¶¶ 30-32. To survive a motion for summary judgment, Sain must set forth facts raising a genuine issue for trial regarding Strock, Isham, or Kokas' deliberate indifference to the problems with his drinking water. In his opposition to summary judgment, Sain discusses the liability of Thomas Monahan, another of the Department of Human Services defendants, but fails to specifically address Strock, Isham and Kokas.

Even if Sain did not intend to concede his claims against Strock, Isham and Kokas on Count II, the facts he sets forth are insufficient to defeat summary judgment. In the context of discussing Monahan's deliberate indifference, Sain notes that Strock, Isham and Kokas did not drink the water

21

at the Joliet facility. Pl. Resp. Facts (DHS) at ¶ 30-32, 92. Sain testified Strock told him the water was unsafe to drink, but told him the water was treated. *Id.* at ¶ 30-32, 91. Sain notes that Isham was aware of complaints about the water and that bottled water was brought in for employees. *Id.* at ¶ 30. But Sain admitted he had no reason to believe Isham or Kokas believed the water was unsafe to drink. *Id.*

Sain fails to offer evidence that Strock, Isham and Kokas knew the water presented a serious health risk to him in particular. He does not set forth facts showing they knew he was HIV positive or that he had chronic gastric problems. However, as housing unit directors, a reasonable jury could infer they knew of his HIV status and his health problems because he was regularly treated by the medical staff. But awareness of his HIV status does support a reasonable inference these defendants were aware the water was dangerous to Sain. Viewing the facts in the light most favorable to Sain, the record is insufficient to defeat summary judgment. Accordingly, summary judgment must be granted in their favor on Count II.

### (b)   Monahan

Monahan became director of the Treatment and Detention Program for Sexually Violent Persons in September 2005. DHS Facts at ¶ 3. Prior to 2005, Monahan served in a variety of different capacities at the Joliet facility. Pl. Resp. Facts (DHS) at ¶ 3. Monahan contends he did not know about Sain's HIV status and the effect of the drinking water on his health. DHS Reply at 5. Monahan testified he did not know the water at the Joliet facility was hazardous, and denies he ever instructed the staff or residents at the Joliet facility not to drink the water. DHS Facts at ¶¶ 45-47. Sain disputes Monahan's testimony, arguing Monahan knew the water was unsafe because he was aware of annual notices regarding violations with respect to levels of radioactive contaminants

22

in the Joliet facility water supply. Pl. Resp. Facts (DHS) at ¶ 36. The reports indicate that persons with HIV may be more vulnerable to contaminants in the water than other persons. *Id.* Monahan knew the union supplied bottled water for employees at the Joliet facility and did not drink the facility's water himself. *Id.*

Sain did not tell Monahan he believed the water was harmful to his health due to his HIV infection. DHS Facts at ¶ 36. Nonetheless, Sain argues Monahan knew his HIV status because Monahan responded to a grievance in which Sain complained to Vance about his living conditions affecting his health. Pl. Resp. Facts (DHS) at ¶ 36. Because Monahan knew from the grievance that Sain complained to Vance about living conditions adversely affecting his health, Sain argues Monahan also knew about his HIV status. *Id.* Viewing the facts in the light most favorable to Sain, a reasonable jury could infer Monahan knew that the water could negatively affect Sain's health because of his HIV status. Sain Mem. at 20. As director of the treatment program, a reasonable jury could also infer that Monahan knew about the individuals in the treatment program and knew about Sain's HIV status and health problems, especially because Sain complained about his situation to a number of Joliet medical and psychological care providers. According to Sain, Monahan could have easily addressed the problem by providing bottled water to HIV positive residents, who constitute only 1% of the Joliet facility's population. *Id.* at 22.

The fact that Monahan knew some employees were provided with bottled water by their union alone is not sufficient to show Monahan was aware of a risk of harm from the water. *Carroll v. DeTella*, 255 F.3d 470, 473 (7th Cir. 2001) ("the fact that [a] prison gave bottled water free of charge to its own staff does not show an awareness of a substantial hazard"). However, based on Monahan's position, and the fact that he was aware of Sain's grievance against Vance regarding his

23

living conditions, there is sufficient evidence to support a reasonable inference that Monahan knew or inferred that Sain was HIV positive and the water might have a dangerous effect on his health. Accordingly, summary judgment must be denied.

## V. Motion to Strike

The Liberty defendants move to strike and deem admitted portions of Sain's Local Rule 56.1(b)(3)(B) response on the grounds they are too lengthy and contain legal arguments, legal conclusions, additional facts, and speculative and conclusory statements. Sain does not oppose the motion. The Liberty defendants' motion to strike Sain's Local Rule 56.1(b) response is addressed below.

### A. Legal Standard

Consistent with Rule 56, Local Rule 56.1 requires a party opposing summary judgment to file a concise response to the movant's statement of facts, and in case of any disagreement, to refer to affidavits or the record. LR 56.1(b)(3)(B). Legal arguments are "not a recitation of a 'fact' to which an affiant is competent to testify" and therefore do not belong in a Local Rule 56.1(b)(3)(B) response. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); *see also Salamanca v. Robert Half Corp.*, No. 02 C 5033, 2003 WL 1825561, at *2 (N.D. Ill. Apr. 4, 2003) (Conlon, J.) (striking legal argument in Local Rule 56.1 statement). Nor may a response contain additional facts beyond the movant's statement, because they must be submitted separately. *See* LR 56.1(b)(3)(C); *see also Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005) (a district court may refuse to consider additional facts submitted in a Local Rule 56.1(b)(3)(B) response). A response may be stricken for failure to comply with these rules. *O'Regan v. Arbitration Forums, Inc.*, 246

24

F.3d 975, 987 (7th Cir. 2001) (a district court has discretion to enforce these rules "strictly or somewhat leniently").

### B.     Sain's Local Rule 56.1(b)(3)(B) Response

The Liberty defendants move to strike portions of 26 paragraphs of Sain's Local Rule 56.1(b)(3)(B) response because they contain legal arguments, additional facts or improper speculation. The Liberty defendants also move to strike and deem admitted five paragraphs of Sain's repsonse because his denials are non-responsive or lack support in the record. Portions of the paragraphs must be stricken.[5]

- **Paragraph 7:** The Liberty defendants state Sain did not discuss certain issues regarding his living conditions with Wood. Sain denies the Liberty defendants' statement, but his response is defective because it includes additional purported facts regarding a written grievance and letter he sent to Wood, and his unsuccessful attempts to meet with Wood. The additional facts are stricken.

- **Paragraph 8:** The Liberty defendants state Sain does not know if Wood received his correspondence, nor did he ask if Wood had received it. Sain denies this statement, but his response is defective because it includes the same additional purported facts as his response to paragraph 7. The additional facts are stricken.

- **Paragraph 10:** The Liberty defendants state Wood was not aware of Sain's concerns about how his HIV status was affected by his living conditions. Sain denies Wood was not aware. Sain cites Wood's deposition, as well as other parts of the record, in support of his denial. Sain's response is proper under Local Rule 56.1(b)(3)(B) and should not be stricken, nor should the paragraph be deemed admitted.

- **Paragraph 11:** The Liberty defendants state Wood was not aware of Sain's grievances, nor was he aware of Sain's letters to the Department of Human Services Secretaries Baker and Adams. Sain denies this statement, but his response is defective because it includes additional purported facts regarding a letter he sent to

_____

[5]For the sake of brevity, the court does not restate each paragraph of the Liberty defendants' Local Rule 56.1(a)(3) statement (Dkt. No. 110 (July 19, 2006)) and Sain's Local Rule 56.1(b)(3)(B) response (Dkt. No. 131 (Aug. 21, 2006)).

Wood concerning his living conditions and his requests to speak with Wood. These additional facts are stricken.

- **Paragraph 12:** The Liberty defendants state that Jumper's only interaction with Sain was as a member of the behavior committee. Sain admits Jumper testified as stated in Paragraph 12, but his response is defective because it includes additional purported facts regarding a grievance response from Jumper, a letter Sain sent to Jumper, and Sain's requests to speak to Jumper. These additional facts are stricken.

- **Paragraph 14:** The Liberty defendants state that Jumper did not receive any correspondence or requests from Sain. Sain admits Jumper testified as stated in Paragraph 14, but his response is defective because he provides additional purported facts regarding his conversation with Jumper, the grievance response he received from Jumper, and a letter he wrote to Jumper regarding his living conditions. These statements are stricken.

- **Paragraph 15:** The Liberty defendants state Jumper was not aware of Sain's concerns about the effect of his living conditions on his HIV status. Sain denies that Jumper was not aware of his living conditions. Sain's response is defective because he includes additional purported facts describing his discussion with Jumper about his desire to move to the new unit, a grievance response he received from Jumper, a letter he sent to Jumper about his living conditions, and his requests for further meetings with Jumper. These additional factual statements are stricken.

- **Paragraph 16:** The Liberty defendants state that Jumper was not aware Sain had written the Department of Human Services Secretaries Baker and Adams. Sain admits Jumper testified as stated in Paragraph 16, but his response is defective because he includes additional purported facts about his attempts to contact Jumper. These statements are stricken.

- **Paragraph 17:** The Liberty defendants state Sain never wrote to Jumper about the roaches, wasps, flies, bees and spiders in his cell. Sain admits Jumper testified as stated in Paragraph 17, but his response is defective because he includes additional purported facts about his attempts to contact Jumper. These statements are stricken.

- **Paragraph 18:** The Liberty defendants state Sain does not know if Jumper received his correspondence and did not ask. Sain admits Jumper testified as stated in Paragraph 18, but his response is defective due to additional purported facts regarding his attempts to contact Jumper. The additional facts are stricken.

- **Paragraph 22:** The Liberty defendants state Chankin did not recall Sain discussing his living conditions and health concerns when he appeared before the behavior committee. Sain admits Chankin testified as stated in Paragraph 22, but his response

is defective because it includes additional purported facts regarding Chankin's knowledge about Sain's HIV status, a conversation he had with her about the roaches and insects in his cell, a letter he wrote her about his living conditions, and a request he made to speak with her. These facts are stricken.

- **Paragraph 24:** The Liberty defendants state Sain did not write to Chankin about his living conditions. Due to a typographical error, they mistakenly cite Chankin's deposition instead of Sain's deposition for support. Sain denies the statement, arguing it is not supported by the record. The Liberty defendants argue the paragraph should be deemed admitted because it is an accurate statement of Sain's deposition testimony, notwithstanding their mistake.

  The Liberty defendants also argue Sain's contention that he wrote to Chankin should not be considered by the court because it conflicts with Sain's prior deposition testimony. In his deposition, Sain testified he *told* Chankin about the roaches in his room, but he did not write to her about them. Liberty Facts, Ex. B at 45-46. The Liberty defendants contend the court should not consider Sain's statement based on the rule that an affidavit that conflicts with earlier deposition testimony must be disregarded. *Velez*, 442 F.3d at 1049. However, The Liberty defendants fail to cite authority in support of their argument that the rule extends to contradictory discovery responses as well as affidavits. The Liberty defendants have not provided convincing authority that Sain's statement should be disregarded.

- **Paragraph 25:** The Liberty defendants state Chankin did not recall Sain's reasons for requesting a transfer to the new unit during her tenure on the rooming committee, but she knows that Sain's request was denied due to his "acting out." Sain admits Chankin served on the rooming committee, but denies that she does not recall the basis of his request to transfer, and that his request was denied due to "acting out." Sain's response is defective because he improperly speculates about Chankin's beliefs, and because it includes additional purported facts about his oral and written contacts with Chankin. These additional facts must be stricken, and the paragraph deemed admitted.

- **Paragraph 26:** The Liberty defendants state Chankin never saw Sain's letters to the Department of Human Services Secretaries Baker and Adams. Sain's response is proper. Citing Chankin's deposition testimony, Sain clarifies Chankin actually testified she had never seen Sain's letters since she has been on the rooming comittee.

- **Paragraph 27:** The Liberty defendants state Sain never told Chankin that his living conditions were negatively impacting his HIV status and never indicated his HIV condition worsened while at the Joliet facility. Sain's response is defective because it lacks support in the record and speculates as to Chankin's beliefs. Sain improperly

includes additional purported facts stating Chankin knew of his HIV status, that he told Chankin about the roaches and insects in his cell, that he wrote to Chankin about his living conditions and requested to speak with her about them. These responses are stricken.

- **Paragraphs 28 and 30:** The Liberty defendants state Chankin has no concerns regarding the safety of the water at the Joliet facility and Sain never expressed his concerns about the water to Chankin. Sain admits that Chankin testified as stated. His response is defective because it provides additional purported facts about Environmental Protection Agency reports and records relating to the water at the Joliet facility. These responses are stricken.

- **Paragraph 32:** The Liberty defendants state that Chankin was only aware of one of Sain's requests to transfer to the new unit. Sain denies this statement, citing his multiple requests to move between 2001 and 2005, and noting that Chankin served on the rooming committee during 2004 and 2005. Sain's response is defective because it improperly speculates as to Chankin's knowledge. Sain's response includes additional purported facts regarding his conversation with Chankin about the roaches and insects in his cell, his letter to Chankin and his request to speak with her. These responses are stricken.

- **Paragraph 35:** The Liberty defendants state Sain has appeared before the behavior committee on at least six occasions. Sain's response is defective because it is argumentative and fails to admit or deny the Liberty defendants' statement that he has appeared six times before the behavior committee. Sain's response is stricken and the paragraph deemed admitted.

- **Paragraph 36:** The Liberty defendants state that prior to transferring to the Joliet facility, the Department of Corrections disciplined Sain for sexual misconduct, and Sain had sex with five to fifteen individuals. Sain admits this statement, but objects to its relevance. The statement is relevant to the purported reasons given by the rooming committee for denying Sain's request to transfer, which included the risk of sexual misconduct.

- **Paragraph 37:** The Liberty defendants discuss aspects of Sain's sexual deviance and medication prescribed to him to reduce his sexual arousal, which he ultimately quit taking. Sain objects to the summary of his testimony. Sain's response is proper. The Liberty defendants' statement does not accurately describe Sain's testimony.

- **Paragraph 38:** The Liberty defendants summarize Anyanwu's testimony regarding three individuals who requested HIV tests from him after purportedly engaging in anal sex with Sain. Sain contends the statement is not supported by Anyanwu's testimony, but admits that three individuals spoke with Anyanwu regarding HIV tests

after engaging in consensual sex with Sain. Sain's response is proper. The Liberty defendants' statement does not accurately reflect Anyanwu's testimony because it refers to anal sex instead of consensual sex.

- **Paragraph 41:** The Liberty defendants describe the Joliet facility's initiation in 2005 of a formal requirement that residents be in treatment to be housed in the new unit. Sain's response, admitting parts of the statement but denying that treatment is a formal requirement, lacks support in the record. Accordingly, the paragraph is deemed admitted.

- **Paragraph 42:** The Liberty defendants explain that the new unit never housed single residents in double rooms. Sain's response, admitting parts of the statement but denying that the new unit never housed single residents in double rooms, lacks support in the record. Accordingly, the paragraph is deemed admitted.

- **Paragraph 44:** The Liberty defendants state that Sain never appeared before the rooming committee. Sain admits this statement, but his response is defective because it includes additional purported facts regarding persons permitted to attend rooming committee meetings and persons serving on the rooming committee. These responses are stricken.

- **Paragraphs 49, 50, and 51:** The Liberty defendants describe the rooming committee's reasons for denying Sain's request to transfer to the new unit. Sain's responses are defective because they are argumentative and dispute the deponents' testimony. Sain's response is stricken and the paragraphs deemed admitted.

- **Paragraph 55:** The Liberty defendants state that Jumper did not speak to the grievance examiner who denied Sain's grievance, and that Wood was not aware of the grievance. Sain's response is defective because he does not admit or deny that Wood testified as stated. In addition, he submits additional purported facts about his attempts to contact Wood in writing and by requesting to speak with him about his living conditions. Sain's response is stricken and the paragraph deemed admitted.

- **Paragraph 58:** The Liberty defendants contrast Sain's appearances before the behavior committee for sexual misconduct and fighting with an unnamed resident whose only appearance before the behavior committee was for a minor matter. Sain's response is defective. He admits he has appeared before the behavior committee on several occassions, but adds purported facts about his incidents of misconduct. These responses are stricken.

## CONCLUSION

For the reasons set forth above, the motion to strike and the motions for summary judgment are granted in part and denied in part. Summary judgment is granted in favor of all defendants on Sain's racial discrimination claim in Count I, and Counts III, IV and V in their entirety. Summary judgment on Count I is granted as to Liberty Healthcare Corporation, Vance, Jumper, Chankin, Strock, and Isham, and denied as to Anyanwu and Wood. Summary judgment on Count II is granted as to Strock, Isham and Kokas, and denied as to Anyanwu, Vance and Monahan.

ENTER:

Suzanne B. Conlon
Suzanne B. Conlon
United States District Judge

September 28, 2006

30